# IN THE SUPREME COURT OF TENNESSEE
## AT KNOXVILLE
### January 3, 2001 Session

## CUTLER-HAMMER, A DIVISION OF EATON CORP. v. TIMOTHY L. CRABTREE

**Appeal from the Supreme Court Special Workers' Compensation Appeals Panel**
**Circuit Court for Bradley County**
**No. V-95-721     R. Steven Bebb, Judge**

---

**No.  E1998-00845-SC-WCM-CV - Filed September 7, 2001**

---

We granted review in this cause to determine whether the trial court erred in finding Timothy L. Crabtree permanently and totally disabled as a result of mental and physical injuries sustained while working for Cutler-Hammer.  Crabtree injured his back while working on a production line; then, during treatment for the back injury, he developed severe depression.  The trial court found that Crabtree was permanently and totally disabled as a result of the combined effect of his mental and physical injuries.  The Special Workers' Compensation Appeals Panel rejected this finding, concluding instead that Crabtree's mental disorder was not compensable because it was not connected to his back injury, which was compensable.  On review, we conclude that Crabtree's mental disorder resulted from his physical injury.  We hold, therefore, that Crabtree's mental disorder is compensable, and we affirm the judgment of the trial court.

**Tenn. Code Ann. § 50-6-225(e)(5)(B); Findings of Fact and Conclusions of Law of the**
**Special Workers' Compensation Appeals Panel Accepted in Part and Rejected in Part;**
**Judgment of the Circuit Court Affirmed**

ADOLPHO A. BIRCH, JR., J., delivered the opinion of the court, in which E. RILEY ANDERSON, C.J., FRANK F. DROWOTA, III, and JANICE M. HOLDER, J., joined.  WILLIAM M. BARKER, J., not participating.

Robert S. Thompson, Cleveland, Tennessee, for the appellant, Timothy L. Crabtree.

George Lane Foster, Chattanooga, Tennessee, for the appellee, Cutler-Hammer, a division of Eaton Corp.

## OPINION

### I.  Facts and Procedural History

Timothy L. Crabtree, the appellant, a 43-year-old high school graduate, began working for Cutler-Hammer, a division of Eaton Corp. (Cutler-Hammer) in March 1977. During the 18 years in which he worked for Cutler-Hammer, his work assignments all included manual labor. His seniority enabled him to be assigned to one of the least strenuous production lines available in the plant. In February 1995, however, his supervisor moved him to a more physically demanding job because his co-workers complained repeatedly that he had been slacking on the production line. On February 28, 1995, shortly after being moved to the more strenuous production line, Crabtree was pulling a case of parts from a shelf when he felt severe pain in his back. He immediately reported the injury to a co-employee and to Cutler-Hammer's personnel department.[1]

On the day of Crabtree's injury, Cutler-Hammer arranged an appointment with Paul Smith, M.D., a general practitioner. Smith treated Crabtree and returned him to work the next day, and the supervisor placed him back on the same job he was performing when he was injured. Later that morning, however, after a conversation with Smith, Cutler-Hammer provided Crabtree with light duty work. Crabtree continued under Smith's care for several months. His therapy included cortisone injections, pain medication, and physical therapy. While Crabtree was under Smith's care, Cutler-Hammer scheduled him to work overtime on Saturdays. When Smith sent a letter to Cutler-Hammer stating that Crabtree should not be required to work on Saturdays, the company informed Crabtree that he would be required to work overtime in the evenings. Crabtree then obtained a second note instructing Cutler-Hammer that he should be limited to 40-hour work weeks. Thereafter, Cutler-Hammer sent Crabtree to its welding department, where he was placed on a job which required him to bend, twist, and turn his back in order to perform his assigned work. Crabtree apparently was not relieved from this position until Smith sent a third note to Cutler-Hammer to emphasize that he had placed Crabtree on light duty and had restricted him from performing duties which involved bending, twisting, and turning his back.

Eventually, Smith referred Crabtree to Kevin Bailey, M.D., an orthopedic surgeon. Bailey examined Crabtree, took X-rays, and performed an MRI scan of Crabtree's spine, but found only minor degenerative changes which he concluded were not the cause of Crabtree's pain. Bailey diagnosed Crabtree as having a lumbar strain with right sacroiliitis, treated him with physical therapy, and kept him on light duty for several months, but he opined that Crabtree had suffered no permanent impairment from his back injury.

Crabtree also consulted his family physician, internal medicine specialist Kent Chastain, M.D. Chastain diagnosed Crabtree as suffering from various maladies including gastroesophageal reflux disease and lumbar strain, but his examination of Crabtree's lumbar spine revealed no objective abnormalities. He noted in his records, however, that Crabtree was "especially stressed and was extremely emotional and was crying because of the pressure on him at work." Because he

---

[1]In its supplemental brief, Cutler-Hammer insinuates that Crabtree was untruthful in claiming that he injured his back. At trial, however, Cutler-Hammer stipulated that Crabtree suffered an injury on February 28, 1995.

suspected that Crabtree might be suffering from depression, he recommended that Crabtree see a clinical psychologist.

On July 24, 1995, Bailey released Crabtree to return to work without restrictions. After Crabtree returned to regular duty, Cutler-Hammer placed him on an even more physically demanding job, which consisted of heavy lifting, twisting, turning, and repetitive moving of boxes which weighed over 70 pounds. Crabtree's pain continued, but his requests for additional medical treatment were denied. When he informed his supervisor that he could "hardly stand" the pain he was experiencing, his supervisor responded, "our company doctor is through with you. If you think you can get your own doctor to get you out, get out."

During this period of time, Crabtree's mental condition deteriorated significantly, and he began experiencing emotional breakdowns and persistent vomiting before and after work. At trial, Crabtree's wife testified that during the summer and fall of 1995, Crabtree began crying frequently in front of her and his daughters. She stated that Crabtree had always been very strong and that he had never been emotionally unstable before he injured his back, but after his injury he would routinely have emotional breakdowns whenever anyone discussed his supervisors at work. She further testified that he had nightmares and difficulty sleeping because of anxiety, back pain, and the fear of losing his job and health insurance. When Cutler-Hammer informed Crabtree that he would be fired unless he met certain production standards, he decided that he could no longer perform his job because of his back pain and emotional difficulties and quit.

In February 1996, Crabtree's emotional difficulties led him to consult Joseph Ball, M.D., P.C., a board-certified psychiatrist. Ball noted that Crabtree exhibited symptoms including crying spells, frequent depressive mood episodes, problems with frustration and anger, nightmares, and general anxiety, and he diagnosed Crabtree as suffering from major depression with some post-traumatic features. Ball prescribed anti-depressant medication to treat Crabtree's depression and a muscle relaxant to treat his persistent back pain. On the basis of Crabtree's depression, he assigned Crabtree an impairment rating of 25 percent to the body as a whole. Ball testified in a deposition that Crabtree's perceived mistreatment at Cutler-Hammer, his feelings of inadequacy, his anxiety over his inability to care for his family, and his lack of income all contributed to his depression. He ultimately decided, however, that the depression was directly related to his work injury and that he would not have developed a mental disorder had he not sustained that injury. Although Ball indicated that Crabtree's condition might improve somewhat in the future, he opined that Crabtree's impairment probably would not improve beyond the 25 percent impairment rating he had assigned.

On the advice of his attorney, Crabtree consulted orthopedic surgeon Walter H. King, Jr., M.D., for an independent medical evaluation. King noted that Crabtree exhibited a decreased range of motion in his lower back and that an MRI showed mild degenerative changes. King diagnosed Crabtree as suffering from degenerative disk disease, which he concluded had been aggravated by Crabtree's back injury. Based on his examination, King assigned Crabtree an impairment rating of 11 percent to the body as a whole, attributing 6 percent of the impairment to the degenerative disc disease and 5 percent to ongoing lower back pain. King acknowledged that it would be impossible

to discern how much of the 6 percent impairment assigned to the degenerative disc disease could be ascribed to aggravation from the work injury.

Cutler-Hammer filed suit against Crabtree pursuant to Tenn. Code Ann. § 50-6-225(a)(1) (1999), requesting that the court absolve the company of liability for Crabtree's injuries.[2] After a hearing, the trial court found that Crabtree was permanently and totally disabled as a result of the combined effects of his physical and mental injuries. In a Memorandum Opinion, the trial judge stated,

---

[2]In its Memorandum Opinion, the Special Workers' Compensation Appeals Panel noted:

> This suit is somewhat unusual in that the employer filed suit against the employee in what is commonly referred to as a "jump suit." The workers' compensation law . . . allows suits to be filed either by the injured worker, or by the employer. . . . When such suit is filed by the employer, the burden of proof . . . rests upon the worker, to prove by a preponderance of the evidence . . . every factual allegation upon which he relies for recovery. To the extent that the complaint filed by the employer seeks the decision of the Court fairly establishing the percentage of vocational disability and other contested matters, the employee's answer may fairly set forth the issues presented before the Court. Frequently, however, and as a general rule, the better practice for the worker is that of filing of a counter-action, setting forth the grounds upon which he seeks to recover. Although at trial the practice under our rules of procedure is to provide the opportunity for the plaintiff to present his proof first, followed by that of the defendant . . . , this is true because the burden of proof generally falls upon the plaintiff. In a "jump suit" the burden of proof being upon the defendant, we believe the better procedure to be that of allowing the worker, or the defendant, to proceed to present his evidence first, followed by the evidence presented by the plaintiff. Similarly, opening statements and closing statements of counsel should be presented such that the worker has the opportunity to make his opening statement first, and closing statements should also be presented such that the worker has the opportunity to present his closing presentation first, and then has the opportunity to answer the final argument of the employer, again for the reason that the worker has the burden of proof.

> The rule may appear to remove from the employer some of the advantages of filing a "jump suit," but appears to be proper when the procedural burdens of the parties are considered. The employer still has the advantage of selecting the forum for the litigation when filing a "jump suit."

> At trial in this cause, the employer proceeded first at each stage of the hearing. While we do not assign reversible error because of this procedure, we do feel that the better practice is to . . . allow the worker, who has the burden of proof, to present his case first.

We adopt the statements of the Panel regarding this issue.

-4-

The most persuasive testimony is that of Mr. Crabtree himself. This Court finds that Mr. Crabtree reached maximum medical improvement on January 21, 1997 when rated by Dr. Ball. The Court finds further that the treatment of Mr. Crabtree at Cutler-Hammer when he was unable to work . . . was certainly inconsistent with 18 years of excellent work history with no injuries and no exhibitors of psychiatric disorders. The Court finds that there was a concerted effort by Cutler-Hammer to get rid of Mr. Crabtree whether they believed him to be a malingerer or just wanted to be free of an injured employee.

In making his findings of fact, the trial judge did not distinguish what portions of Crabtree's total disability could be attributed to his physical or his mental injury.

Cutler-Hammer appealed, and the Special Workers' Compensation Appeals Panel considered this matter. Regarding Crabtree's physical injury, the Panel found that he was entitled to compensation for a 5 percent anatomical impairment due to chronic pain, though it rejected the additional 6 percent anatomical impairment found by King because the record did not reflect any evidence of an anatomical change in Crabtree's pre-existing degenerative condition. After considering evidence regarding Crabtree's age, education, skills, training, and employment opportunities, the Panel concluded that Crabtree possessed minimal ability to secure employment and was entitled to an award of 30 percent permanent partial disability to the body as a whole.[3]

Regarding Crabtree's mental injury, however, the Panel disagreed with the trial court. The Panel found that the mental injury had been brought about primarily by the criticism Crabtree received from his supervisors and co-workers and by Crabtree's fear that he would lose his job. Noting that Crabtree's co-workers and supervisors had criticized his work performance even before he suffered his back injury, the Panel concluded that his mental injury was independent from his physical injury. Holding that "[f]ear that one might lose his job and benefits of his employment . . . is not within itself sufficient to require payment of compensation benefits," the Panel concluded that Crabtree's mental injury was not compensable. We granted review in this cause pursuant to Tenn. Code Ann. § 50-6-225(e)(5)(B) in order to determine whether the trial court erred in finding that Crabtree's mental injury was compensable. Because we conclude that the preponderance of the evidence supports the trial court's finding of a causal connection between Crabtree's back injury and his severe depression, we reject the Panel's findings of fact and conclusions of law regarding the mental injury and affirm the judgment of the trial court.

## II. Standard of Review

---

[3]On review, this Court agrees with the Panel's conclusion that Crabtree suffered a permanent impairment as a result of his physical injury and that he should be awarded compensation for the vocational disability caused by that impairment. Consequently, we accept the Panel's findings of fact and conclusions of law concerning the physical injury.

In workers' compensation cases, the standard of review is de novo upon the record, accompanied by a presumption of the correctness of the trial court's factual findings, unless the preponderance of the evidence is otherwise. Tenn. Code Ann. § 50-6-225(e)(2); Spencer v. Towson Moving and Storage, Inc., 922 S.W.2d 508, 509 (Tenn. 1996). The application of this standard requires the Court to weigh in more depth the factual findings and conclusions of the trial court in a workers' compensation case. Cleek v. Wal-Mart Stores, 19 S.W.3d 770, 773 (Tenn. 2000). When the trial judge has seen and heard a witness's testimony, considerable deference must be accorded on review to the trial court's findings of credibility and the weight to be accorded to that testimony. Townsend v. State, 826 S.W.2d 434, 437 (Tenn. 1992); Humphrey v. David Witherspoon, Inc., 734 S.W.2d 315, 315 (Tenn. 1987).

## III. Analysis

In order to recover benefits under the Tennessee's Workers' Compensation Act, an employee must prove that he or she has suffered an "injury by accident arising out of and in the course of employment." Tenn. Code Ann. § 50-6-102(12) (1999). An injury is considered to be "by accident" when it is "produced by an 'unusual combination of fortuitous circumstances.'" Continental Ins. Co. v. Dowdy, 560 S.W.2d 619, 621 (Tenn. 1978) (quoting Brown Shoe Co. v. Reed, 350 S.W.2d 65, 69 (1961)). An injury is deemed to arise out of the employment "when there is apparent to the rational mind . . . a causal connection between the conditions under which the work is . . . performed and the resulting injury, and occurs in the course of one's employment if it occurs when an employee is performing a duty he was employed to do." Fink v. Caudle, 856 S.W.2d 952, 958 (Tenn. 1993)(citations omitted). In Tindall v. Waring Park Ass'n, this Court defined the "causal connection" required before an injury will be held compensable:

> [B]y "causal connection" is meant not proximate cause as used in the law of negligence, but cause in the sense that the accident had its origin in the hazards to which the employment exposed the employee while doing his work. Although absolute certainty is not required for proof of causation, medical proof that the injury was caused in the course of the employee's work must not be speculative or so uncertain regarding the cause of the injury that attributing it to the plaintiff's employment would be an arbitrary determination or a mere possibility. If, upon undisputed proof, it is conjectural whether disability resulted from a cause operating within petitioner's employment, or a cause operating without employment, there can be no award. If, however, equivocal medical evidence combined with other evidence supports a finding of causation, such an inference may nevertheless be drawn by the trial court under the case law.

725 S.W.2d 935, 937 (Tenn. 1987)(citations and internal quotation marks omitted).

Because of the difficulty in pinpointing the exact cause of many mental injuries, Tennessee courts have long struggled to define precisely when a mental injury will be deemed an injury by accident arising out of the employment. In so doing, they have endeavored to strike a balance between compensating employees for their injuries and ensuring that employers are not obligated to bear the costs of spurious claims or claims whose true origins lie outside the workplace. Cf. Jose v. Equifax, 556 S.W.2d 82, 84 (Tenn. 1977) (stating that the Tennessee Workers' Compensation Act "does not embrace every stress or strain of daily living or every undesirable experience encountered in carrying out the duties of a contract of employment" and noting that "[workers'] compensation coverage is not as broad as general, comprehensive health and accident insurance"); Lawrence Joseph, The Causation Issue in Workers' Compensation Mental Disability Cases, 36 Vand. L. Rev. 263, 291 n.113 (1983) (discussing the use of a "discernible objective event" as a "badge of reliability" which may be used to objectively determine the causal connection between employment and a mental injury). In crafting this balance, Tennessee courts have resolved that mental injuries should be compensable when shown to be work-related, but, under the statutory "injury by accident" requirement, there must be a specific incident that triggers the injury. See 26 Tenn. Jur. Workers' Compensation § 24 (1999). Thus, Tennessee has allowed compensation for a mental injury when that injury has been caused by either (1) a compensable physical injury, or (2) a sudden or unusual mental stimulus, such as a fright, shock, or even excessive, unexpected anxiety. See Jose, 556 S.W.2d at 84; but see Allied Chem. Corp. v. Wells, 578 S.W.2d 369, 373 (Tenn. 1979) (holding that worry, anxiety, and stress "within the bounds of the ups and downs of emotional normal human experience" are insufficient to support an award).

In this case, the only medical proof offered concerning the origins of Crabtree's mental injury was Ball's deposition testimony. Ball conceded that Crabtree's worries over his financial ability to support his family and his perceived mistreatment at work contributed to his depression, but he testified repeatedly and unequivocally that those worries resulted from Crabtree's physical injury and that he would not have developed the depression he suffered had he not been injured at work. None of the evidence offered by Cutler-Hammer controverts Ball's testimony. Moreover, Crabtree, whose testimony the trial court found persuasive, attributed his depression to his physical injury, as did his wife. Based on this testimony, we conclude that the preponderance of the evidence supports the trial court's conclusion that Crabtree's mental injury had its origin in the work-related back injury he suffered on February 28, 1995. Therefore, we affirm the trial court's conclusion that Crabtree's mental injury is compensable. Given Crabtree's age, work history, education, and limited job opportunities, we conclude that the evidence does not preponderate against the trial court's determination that Crabtree has been rendered permanently and totally disabled by the combined effects of his physical and mental injuries.

## IV. Conclusion

For the foregoing reasons, we hold that Crabtree's mental injury was caused by a physical injury arising out of and in the course of his employment, and therefore we find the mental injury to be compensable. Accordingly, we reject the findings of fact and conclusions of law of the Special Workers' Compensation Appeals Panel regarding Crabtree's mental injury, and we affirm the

decision of the trial court. Costs on this appeal will be taxed to Cutler-Hammer, for which execution may issue if necessary.

_____
ADOLPHO A. BIRCH, JR., JUSTICE