IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
February 18, 2005 Session

## MARY ELIZABETH JACKSON v. SAMUEL WILLIAM BOWNAS, ET AL.

**Appeal from the Circuit Court for Blount County**
**No. E19260     William Dale Young, Judge**

———————————

**No. E2004-01893-COA-R3-CV - FILED JUNE 21, 2005**

———————————

In this boundary dispute between two lot owners in adjacent subdivisions, the trial court relied on an old fence line to establish the boundary and award plaintiff damages for trespass. Given that the deeds and surveys were inconclusive, it is appropriate to look to the most reliable monumentation to establish the line. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Affirmed**

PATRICIA J. COTTRELL, J., delivered the opinion of the court, in which CHARLES D. SUSANO, JR. and D. MICHAEL SWINEY, JJ., joined.

Francis A. Cain, Knoxville, Tennessee, for the appellants, Samuel Bownas and Marybelle Bownas.

Keith McCord, Knoxville, Tennessee, for the appellee, Mary E. Jackson.

### OPINION

This case is a boundary line dispute between two individuals who own homes in adjacent subdivisions. The court found that various surveys of the subject properties were conflicting. Based on testimony of previous owners of both properties and other witnesses, the court found the boundary to be the fence line that had been in existence for 60 years. We affirm.

### I. THE FRANCIS FARM AND SUBSEQUENT CONVEYANCES

The plaintiff, Mary E. Jackson, has owned Lot 5 in the Heritage Square subdivision in Blount County since 1982. Her family, however, has had an ownership interest in the property comprising Heritage Square since 1963. This property was originally part of the "Francis Farm" with the earliest conveyance in this record being from Marley Francis to Edith Francis in 1959. The line along the disputed boundary was described in that 1959 deed as "Beginning on a large post oak a corner to

Riddle and McGill Heirs; thence with McGill Heirs N.65-1/2 E. 1670 feet to a stake with McGill Heirs."[1]

In 1963, the Francis Farm was bought by the husband of Mrs. Jackson, Robert Jackson, and two associates, Robert Haralson, Jr. and Harold Lambert. This deed gave the disputed line as "Beginning at a large post oak in line of Riddle and corner to McGill Heirs; thence (1) with McGill Heirs, north 66 deg. 15 min. east 1660 feet to a stake by a fence post." After the call for the disputed line, the description later references the line to extend further to pins and posts both north and south of a fence line.

A part of the Francis Farm was conveyed to the Ponderosa Corporation which developed the Heritage Hills subdivision from part of the farm. The Heritage Hills subdivision plat was filed in October of 1964. This plat by surveyor Frantz Gregory gives the call along the disputed line as "S 66 degrees 15 minutes W." This plat is particularly significant since subsequent descriptions of the adjoining property subject to this dispute make reference to and expressly adjoin the boundary line described in this 1964 plat of Heritage Hills subdivision.

The remaining portion of the Francis Farm that would ultimately become Heritage Square subdivision was conveyed to Mrs. Jackson's husband in September of 1964, who then conveyed it to Mrs. Jackson the next day. The call for the disputed line in those two deeds read "thence with McGill Heirs N. 66-15E. 944 Feet to the point of beginning, all as shown by survey of Frantz G. Gregory, Surveyor, dated September 1, 1964." Thereafter, Mr. and Mrs. Jackson lived on this property and Mrs. Jackson continued to do so after Mr. Jackson's death. In 1977, E. H. Pitts surveyed the property owned by Mrs. Jackson. At that time, Mr. Pitts showed the call along the disputed boundary to be "N 66 degrees 15 minutes E 571.40 feet."

Mrs. Jackson and her son formed John Galt Co., Inc. as a vehicle to develop the property. This property was apparently transferred to John Galt Co., Inc., and a subdivision plat by surveyor Charles Sterling for Heritage Square subdivision was recorded in 1983. The plat for the Heritage Square subdivision gives the call along the disputed boundary as "N 66 degrees, 22 minutes and 40 seconds E". Mrs. Jackson then bought Lot 5 in Heritage Square and built a home there in 1984 where she has lived since that time.

## II. THE MCGILL FARM AND SUBSEQUENT CONVEYANCES

The defendant Bownases own Lot 70 of the Briarcliff Subdivision No. 6 which originally was part of the "McGill Farm." The earliest deed in this record for the McGill Farm is the deed from the McGill family to Harold and Jean Lambert in 1973. This deed describes the disputed line as "thence (5) with Heritage Hills Subdivision S. 64-38 W. 429.00 feet to a concrete monument; thence (6) with Heritage Hills Subdivision S. 67-37 W. 1225.34 feet to an iron pin . . . as shown by survey of E. H.

---

[1]The adjacent property owned by defendants Samuel and Marybelle Bownas ("Bownases") was originally part of this "McGill Farm."

Pitts . . . dated March 1, 1973." This description was taken from a survey of the McGill Farm by Mr. E. H. Pitts in 1973.

The McGill Farm was sold by the Lamberts to Maryville Realty and Mortgage Company, Inc. in 1981 and developed as Briarcliff Subdivision No. 6. This deed to the developer gave the disputed line as "in line of Heritage Hills Subdivision, as shown by map of record in the Register's office for Blount County, Tennessee, in Map File No. 347B; thence with Heritage Hills Subdivision S 67-36 W 996.52 feet to a 32"oak corner to Jackson . . . as shown by survey of Everett Land Surveyors dated 1/27/81." The plat of the Briarcliff Subdivision No. 6 done by Everett Land Surveyors was recorded in 1981. That plat gave the call along the disputed line as "S 67 degrees 36 minutes W." Later, in 1982, the Bownases bought Lot 70. The deed to the Bownases described the property as "all of Lot No. 70 of the Briarcliff Subdivision, unit 6."

It is clear that the boundary line between the Francis Farm and the McGill Farm became the boundary line between the two subdivisions in which the parties' lots are included. Thus, the disputed boundary is the original boundary line between the two farms.

### III. THE FENCE

There is no dispute that an old fence (or its remnants) exists in and about this disputed boundary line and has been there for a long time. Photographs of old fence posts and trees that have grown around the fence were admitted into evidence.

Prior owners of the Francis Farm and the McGill Farm testified that the fence line was the acknowledged boundary between the two farms. Jim Magill, son of the McGill Farm owner, lived on the McGill Farm for 22 years and helped his father farm it.[2] He testified that his family had owned the property for probably fifty (50) years and that the boundary line between the two farms was the fence line. Harold Lambert, who at various times was a part owner of both the Francis Farm the McGill Farm, testified that he understood the fence to mark the boundary between the farms.

Between 1964 and until it was developed as Heritage Square, Mrs. Jackson testified that her family lived on the Francis Farm property and had horses on it. During that time, her husband and children kept the fence repaired. Mrs. Jackson testified that her family and the McGill family on the adjacent farm tended the land on their respective sides of the fence. During these years, Mrs. Jackson testified that the fence marked the boundary and there was no dispute about it. After Heritage Square was developed, Mrs. Jackson built a home on Lot 5 and continued to live on the property. She testified that the other lot owners in Heritage Square along that property line all considered the fence to be the boundary line.

---

[2]The actual family name is "Magill," but the record and deeds refer to it as "McGill" and we retain that designation.

In addition, John N. Badgett, Jr., a retired judge, testified on the issue. As a young man in the summer of 1937 he worked on the Francis Farm. He testified that the fence had been there since 1937 and that the fence was then considered to be the boundary between the farms.

## IV. THE 2002 PITTS SURVEY AND NEW FENCE

In 2002, Mr. Bownas asked Mr. E. H. Pitts to prepare a survey of his lot. As recounted earlier, Mr. Pitts had previously done other surveys of the properties held by Mrs. Jackson and Mr. Bownas. The 2002 Pitts survey shows that the fence line was not the property line but that much of Mrs. Jackson's backyard was actually part of the Bownases' lot.

Although the Bownases had lived on a lot adjacent to Mrs. Jackson for 20 years, the first time they met was in February of 2002, when Mrs. Jackson found Mr. Bownas walking around in her flower garden. He told her he was trying to determine the property line. She explained she thought the line was the fence. A few days later Mr. Bownas started marking a new line with a cord telling her he planned to put up a fence. Mrs. Jackson testified she offered compromises to avoid litigation such as buying the disputed piece of property or paying for a decorative fence along the old fence line. Neither was accepted.

Mrs. Jackson retained counsel who wrote Mr. Bownas on her behalf on April 12, 2002, advising him that the property line was the old fence line and if he continued to trespass or build a fence on Mrs. Jackson's property, she would ask the court to order removal of the fence and award money damages.

Armed with the 2002 Pitts survey, without further notice to Mrs. Jackson, Mr. Bownas erected a fence on July 1, 2002, across what heretofore had been Mrs. Jackson's backyard. In the process, Mrs. Jackson's wildflower garden and landscaping were damaged. While installing the new chain link fence, the crew hired by Mr. Bownas cut Mrs. Jackson's telephone lines and electric lines. On the day that happened, Mrs. Jackson asked Mr. Bownas if he knew he had cut the telephone line, to which he replied "So I know it now." Mr. Bownas placed a "Posted: Keep Out, No Trespassing" sign on the fence eight feet in front of Mrs. Jackson's sunroom. The new fence was eleven (11) inches from the rear entrance to her home.

Within days after Mr. Bownas had the fence erected, Mrs. Jackson filed a complaint seeking resolution of a boundary line dispute under Tenn. Code Ann. § 16-11-106, ejectment under Tenn. Code Ann. § 29-15-101, and, alternatively, making a claim for adverse possession under Tenn. Code Ann. § 28-2-101 *et seq.* Mrs. Jackson sought compensatory and punitive damages under the tort claims of trespass, outrageous conduct, malicious encroachment and deliberate infliction of emotional distress.

After the fence was installed, through the Bownases' counsel, Mrs. Jackson's attorney got permission for Mrs. Jackson to use a stepladder to go over the fence to tend her flowers. Thereafter,

Mrs. Jackson testified Mr. Bownas told her if she came on his property again, he would call the police. Mr. Bownas recalled that he threatened to call the police if she cut his fence.

With regard to damages, Mrs. Jackson testified that the stress caused by this situation had required that she visit her doctor more frequently. She also explained that she has not had the use of her backyard since the fence was erected.

## V. THE SURVEYS AND BOUNDARY MONUMENTATION

In addition to the descriptions in the deeds discussed previously, the parties introduced several surveys and plats of the properties done over the years. The surveyor hired by the Bownases to do the 2002 survey, Mr. Pitts, testified at length about his 2002 survey, and the surveys he and others had done previously.

According to Mr. Pitts, while the calls for the boundary line in dispute may vary among the surveys and plats due to use of different bearings systems, the monumentation on the ground *i.e.*, iron pins and concrete monuments, have remained constant. Therefore, according to Mr. Pitts, there is no real disagreement or inconsistency among them.

Relevant to this issue is the monumentation marking the corners of the line along the disputed boundary. The monuments in the first survey in 1964, the Heritage Hills plat, are shown on the plat. The second survey, the one Mr. Pitts did for the McGill family in 1973, references existing iron pins and a concrete monument. The two 1977 surveys by Mr. Pitts for Mrs. Jackson reference a new iron pin and an existing concrete monument staking end points of the line which ran 571 feet long. The Heritage Square plat by Sterling Engineering in 1983 references the existing iron pin at one end of the line and then notes that a new iron pin was set at the end staking a line approximately 390 feet in length. The Briarcliff Subdivision plat showing Lot 70 by Richard Everett was recorded in 1981 and references only the oak as a corner monument. A survey of Lot 70 individually was done by Michael Luethke in 1981 which showed the corners of the disputed boundary to be the oak and an existing iron rod. The Luethke survey shows the old fence line. The gap between the old fence line and the S call of "S 67 degrees and 29 minutes W" grows wider along the length of the call to its widest gap where Mrs. Jackson's property adjoins. In 1985 Mr. Pitts surveyed Lot 70 referencing a Black Oak as a corner point and a new iron rod at the other corner of the disputed line staking 366.52 feet. Later, in 1993 Wade Nance did a survey of Lot 70 which gave the same monuments but a slightly different call down the disputed line "S 67 degrees 4 minutes W". This survey showed the remains of the fence slightly within the Lot 70 line. Finally, the 2002 Pitts survey performed for the Bownases notes an existing iron rod at the corner, and a new iron pin to mark the end adjoining Mrs. Jackson, staking a line 362 feet long.

Clearly, the beginning monument designation has changed throughout the surveys including a post oak, black oak, and iron pins. The monumentation marking the end of the disputed line has also changed. Many of the surveys and plats are successively depicting smaller pieces of property so that is one reason new monuments are added to designate new end points. In addition, it is

important to note that new monumentation also had to be added since existing monuments had been removed. Interestingly, the 2002 survey by Mr. Pitts shows a new pin marking the corner of the disputed line.

## VI. THE TRIAL COURT'S RULING

The matter was tried on September 4 and 5 of 2003. The trial court entered a Memorandum Opinion on May 26, 2004, with a final judgment entered on June 28, 2004. The trial court ruled for Mrs. Jackson finding that the old fence was the boundary line, ordering removal of the fence erected by Mr. Bownas and restoration of the damage done to her property and awarding her One Hundred Dollars ($100) per day for the period the Bownases' fence encroached on her property (July 1, 2002 through May 28, 2004 when the Bownases removed the fence) a total of 698 days for a judgment of $69,800.

The trial court made the following findings:

Based on the testimony of the parties, their witnesses and the entire record in this case, the Court is of the opinion and finds that by clear and convincing evidence, Plaintiff has established that the common boundary line in dispute as between these parties has been the fence separating the "Francis Farm" as the "Magill Farm" since at least 1937.

The Court further finds that the subsequent owners of both the "Magill Farm" and the "Francis Farm" recognized the farm fence as the boundary lines, as have their successors in title for many years.

The Court further finds that on September 11, 1964, the Plaintiff and her now deceased husband obtained title to and took possession of the land upon which her residence is now situated; that for almost forty (40) years Plaintiff has openly, notoriously and continuously owned, had exclusive possession of and controlled said property, until Defendants erected a new fence on July 1, 2002.

The Court further finds that many surveys of the various property (even by the same surveyor) are totally inconsistent with one another and that pursuant to applicable Tennessee law, it is the Court's obligation and duty to look to the long established boundary line between these parties as being their true, correct and accurate property line.

Accordingly, the Court concludes that the rear boundary line of Plaintiff's Lot 5 in Heritage Square is the established and existing fence line which separated and was the common boundary line between the "Francis Farm" and the "Magill Farm". The Court also finds and concludes that the Plaintiff and her predecessors in title have owned, used, occupied and possessed the property upon which her residence is

-6-

now situated, same being Lot 5 in Heritage Square and that the common dividing line between the two properties has been the divisional fence line for more than sixty (60) years.

Plaintiff's undisputed testimony is that she has been deprived of the use and benefit of a great portion of her property since July 1, 2002, notwithstanding her attorney's letter to the Defendants dated April 12, 2002, warning them of the consequences of their intended actions. Plaintiff's further undisputed testimony is that she has suffered much stress as a result of the Defendants' actions and that she is entitled to damages for the wrongful confiscation of her property, that she is entitled to have the fence removed at the Defendants' expense and that her real estate be restored to its former appearance all at the Defendants' expense.

Considering the entire record, the Court is of the opinion that the issues in this case are decided in favor of the Plaintiff and against the Defendants. Accordingly, Defendants are ejected from the real property in dispute and any claim of defendants thereto are declared null and void.

## VII. STANDARD OF REVIEW

In resolving a boundary line dispute, the trier of fact must evaluate all of the evidence and assess the credibility of the witnesses. *Mix v. Miller*, 27 S.W.3d 508, 514 (Tenn. Ct. App. 1999). The question of where the correct boundary lies is generally a question of fact. The usual standard of review applicable to bench trials applies in boundary disputes. *Thornburg v. Chase*, 606 S.W.2d 672, 675 (Tenn. Ct. App. 1980). Under that standard, we must review this case *de novo* upon the record with a presumption of correctness of the findings of fact by the trial court, unless the evidence preponderates against these findings. Tenn. R. App. P. 13(d); *Brooks v. Brooks*, 992 S.W.2d 403, 404 (Tenn. 1999). For the evidence to preponderate against a trial court's finding of fact, it must support another finding of fact with greater convincing effect. *The Realty Shop, Inc. v. R.R. Westminster Holding, Inc.*, 7 S.W.3d 581, 596 (Tenn. Ct. App. 1999).

Where there is conflict in testimony, the trial court is in a better position than this court to observe the demeanor of the witnesses and evaluate their credibility. *McCaleb v. Saturn Corp.,* 910 S.W.2d 412, 415 (Tenn.1995). Consequently, appellate courts afford considerable deference to the trial court's findings of credibility and the weight to be given testimony. *Cutler-Hammer v. Crabtree*, 54 S.W.3d 748, 753 (Tenn. 2001). These standards apply in boundary disputes where the trial court, as the finder of fact, is required to choose between two competing surveys. *See Mix*, 27 S.W.3d at 514 ("Based on our review of the record in the instant case, we cannot say that the evidence preponderates against the trial court's conclusion that the Mix deed and Mr. Barrett's survey are preferable to the Miller deed and Mr. Coleman's survey."); *see also Stovall v. Bagsby*, No. M2002-01901-COA-R3-CV, 2003 WL 22768677, at *2 (Tenn. Ct. App. Nov. 24, 2003) (listing cases where trial judge chose between competing surveys); *Edwards v. Heckmann,* No. E20020-02292-COA-R3-CV, 2003 WL 21486987, at *4-5 (Tenn. Ct. App. June 25, 2003) (where proof was

a battle of the experts, *i.e.*, surveyors, reviewing court applied Tenn. R. App. P. 13(d)) and found the evidence did not preponderate against the trial court's findings).

The rules on how a court is to approach a boundary line dispute are well settled in Tennessee:

> In determining disputed boundaries, resort is to be had first to natural objects or landmarks, because of their very permanent character; next, to artificial monuments or marks, then to the boundary lines of adjacent landowners, and then to courses and distances. This rule of construction is to aid in determining the intention of the parties to a deed which is to be determined, if possible, from the instrument in connection with the surrounding circumstances.

*Thornburg*, 606 S.W.2d at 675; *see also Pritchard v. Rebori*, 135 Tenn. 328, 186 S.W. 121, 122 (Tenn. 1916).

## VIII. ANALYSIS

### a) Boundary Line

Applying the applicable standard of review and the established rules governing boundary disputes, we believe the trial court's findings must be upheld. The evidence clearly supports the trial court's finding that the various deeds and surveys of the disputed boundary line are inconsistent and not determinative. The trial court did not accept testimony from the surveyor that these apparent inconsistencies arose due to use of different bearing systems. Therefore, the rules of construction described in *Thornburg* must be applied. Since there are no natural objects or landmarks, then we must turn to artificial monuments or marks to determine the boundary.

The parties agree that this matter is to be decided based upon the relevant artificial monuments. The Bownases argue that the boundary should be determined by reference to the artificial monuments placed by the surveyors, *i.e.*, pins and monuments. Mrs. Jackson, on the other hand, argues that the determinative artificial monument is the old fence and its remnants. We do not believe the evidence preponderates against the trial court's determination that the fence marks the boundary.

The trial court received evidence and heard testimony that placement of new monumentation was routinely necessary. Mr. Bownas testified that the monument marking the corner of the two lots had to be replaced on more than one occasion because the corner pin had a "bad habit" of disappearing. The trial court, after hearing the evidence and weighing the credibility of the witnesses, decided that the fence was the more reliable artificial monument. Based on the record before us, we are unable to disagree.

We must keep in mind that the purpose of the boundary line dispute rules is to determine the intent of the parties to the deed. The trial court heard uncontradicted testimony from a number of

-8-

witnesses whose credibility was not challenged that individuals with ownership interests in both the Francis and McGill Farms believed the boundary to be the old fence. The evidence clearly supports the trial court's finding that since at least 1937, the fence has been considered the boundary. Furthermore, it is likewise clear that for almost forty (40) years Mrs. Jackson and her family have openly and notoriously had exclusive possession and control of the property up to the fence line. Therefore, we affirm the trial court's finding that the fence line is the boundary between the two lots.[3]

### b) Damages

The Bownases also challenge the basis and amount of the damage award of one hundred dollars ($100) for each day the fence was in Mrs. Jackson's backyard. The fence was in Mrs. Jackson's backyard 698 days for a total monetary judgment of $69,800. The basis for the monetary award according to the trial court is confiscation of property or trespass.[4] With regard to our review of damage awards, "whether the trial court utilized the proper measure of damages is a question of law that we review *de novo*." *Beaty v. McGraw*, 15 S.W.3d 819, 829 (Tenn. Ct. App. 1998). The amount of the award, however, is a question of fact if within the limits set by law. *Id*.

There is no question that a party may recover compensatory damages in a trespass action. *Meighan v. U.S. Sprint Communications Company*, 924 S.W.2d 632, 641 (Tenn. 1996). The rules for determining damages in trespass actions "are based upon the purposes for which such actions are maintainable [including t]o give compensation . . . , [and t]o punish wrongdoers and deter wrongful conduct." *Id*. (Citing 75 Am.Jur.2d Trespass § 118, at 89 (1991)). It is well established that damages for temporary injury to property, or trespass, is the injury to the value of the use and enjoyment of the property. *Anthony v. Construction Products Inc.*, 677 S.W.2d 4, 10 (Tenn. Ct. App. 1984); *Citizens Real Estate & Loan v. Mountain States Development Corp.*, 633 S.W.2d 763, 767 (Tenn. Ct. App. 1981) (citations omitted).

Every trespass give a right to nominal damages and a party may recover all consequential damages in a trespass action. *Schumpert v. Moore*, 24 Tenn.695, 149 S.W. 2d 471, 473 (Tenn. Ct. App. 1940) (citing 63 C.J. 1035, 1037). It has been recognized that if trespass causes mental harm, then the trespasser is liable for said harm. 75 Am.Jur.2d Trespass § 145 at 108(1991). "For instance, damages from mental suffering are recoverable if the trespass was committed under circumstances of insult, rude language or treatment, haughtiness, and contempt." *Id*.

There is caselaw to the effect that, commonly, damages for trespass include actual damage to the property and an assessment of the value of the trespasser's use (*i.e.*, rental value or the difference in value before and after the trespass.) *See Cole v. Clifton*, 833 S.W.2d 75, 76-77 (Tenn.

---

[3]Since we have determined that the boundary runs along the fence line, it is not necessary to address whether Mrs. Jackson obtained title by adverse possession.

[4]The court did not find that the defendants committed any intentional tort as alleged in the complaint. The trial court also declined Mrs. Jackson's request for punitive damages which was not appealed.

Ct. App. 1992); *Uhlhorn v. Keltner*, 723 S.W.2d 131, 135 (Tenn. Ct. App. 1986). These cases arise in the context of trespass on property used for profit. We do not believe, however, that this measure of damages is all inclusive in this situation. As the court noted in *Jones v. Morrison*, 458 S.W.2d 434, 439 (Tenn. Ct. App. 1970):

> We must remember that this is not a case in which there was a legal or lawful taking of complainants' land by eminent domain, wherein the authorities cited by defendants' counsel would apply. This was a wilful taking or encroachment by the defendants on complainants' land without authority or legal sanction. The courts can hardly be expected to sanction such action by holding that, after one has unlawfully appropriated the property of another and erected a building thereon, or otherwise appropriated to his use, the only remuneration the owner can claim or expect is the market value of the property taken as measured by the formula laid down in eminent domain cases involving a willing seller and willing buyer.

The trial court obviously placed reliance upon Mrs. Jackson's uncontradicted testimony about the stress and disruption to her use and enjoyment of her home caused by the fence erected by Mr. Bownas. There is no question that Mrs. Jackson's garden and landscaping were damaged by Mr. Bownas' actions. Unlike many other trespass cases, the property involved was not commercial and did not involve timber or mineral rights. This trespass was to Mrs. Jackson's home and clearly interfered with her enjoyment of it. The fence was less than a foot from her back door, was close to and visible from her sunroom, and made her flower garden and landscaping difficult or impossible to access. In addition to the other injuries caused by this trespass, Mrs. Jackson recounted for the court the mental anguish and stress caused by the trespass. This court must give deference to the trial court's findings of credibility, and the evidence supports the implicit finding that Mr. Bownas's conduct contributed to the impact on Mrs. Jackson. We find, therefore, that the trial court had a basis to find that Mrs. Jackson suffered injury, both emotional injury and injury to the use and enjoyment of her home, and used the correct measure to award damages.

The Bownases argue that a damage award of one hundred dollars ($100) per day is excessive. When a trial court hears the case without a jury, the trial's court determination about the amount of the award is accorded a presumption of correctness which we will alter only "when the trial court has adopted the wrong measure of damage or when the evidence preponderates against the amount awarded." *Beaty*, 15 S.W.3d at 829. We do not believe the evidence preponderates against the award.

Mrs. Jackson was clear with Mr. Bownas from the beginning that her property stretched to the old fence line. By letter from her counsel, Mrs. Jackson let him know that she would seek monetary damages if he erected a fence on her property. Mr. Bownas built the fence in spite of the objections of Mrs. Jackson. While Mr. Bownas obtained a survey, he chose to rely on its accuracy to the clear detriment of Mrs. Jackson. Erecting the fence was not Mr. Bownas's only option. He could have filed an action to establish the line.

-10-

When Mr. Bownas built the fence, he assumed the risk that he was mistaken.  Based upon the uncontroverted evidence presented to the trial court, we are unable to find that the evidence preponderates against the amount of the award.  The Bownases also argue that the days Mrs. Jackson's attorney delayed in filing a post-trial brief should not be considered in the damage award.  Again, Mr. Bownas chose to build the fence and let it stay during pendency of this matter.  The fence was in Mrs. Jackson's backyard during this time so we do not believe the award should be reduced for that reason.

The judgment of the trial court is affirmed.  Costs of this appeal are assessed against the appellants, Samuel and Mary E. Bownas.

_____
PATRICIA J. COTTRELL, JUDGE