Judy L. FINK, Plaintiff–Appellant

v.

June CAUDLE, Individually and as Exec-
utrix of Harold C. Caudle and d/b/a
Caudle Veterinary Clinic, Firemans
Fund Ins. Co., and Sue Ann Head, Di-
rector of the Division of Workers' Com-
pensation, Defendants–Appellees.

Supreme Court of Tennessee,
at Nashville.

July 7, 1993.

Alan Housholder and J.P. Barfield, Nashville, for plaintiff-appellant.

Michael Lee Parsons, Gracey, Ruth, Howard, Tate & Sowell, Nashville, for June Caudle and Firemans Fund.

Charles W. Burson, Atty. Gen. and Reporter, Dianne Stamey Dycus, Asst. Atty. Gen., Nashville, for Sue Ann Head, Director.

## ORDER

PER CURIAM.

This case is before the Court upon motion for review pursuant to T.C.A. § 50–6–225(e)(5)(B), the entire record, including the order of referral to the Special Workers' Compensation Appeals Panel, and the Panel's Memorandum Opinion setting forth its findings of fact and conclusions of law, which are incorporated herein by reference:

Whereupon, it appears to the Court that the motion for review is not well-taken and should be denied.

It is, therefore, ordered that the Panel's findings of fact and conclusions of law are adopted and affirmed, and the decision of the Panel is made the judgment of the

Court. The Panel's Opinion shall be published.

IN THE SUPREME COURT OF TENNESSEE
SPECIAL WORKERS' COMPENSATION
APPEALS PANEL
AT NASHVILLE

June 3, 1993

*Members of Panel:*

FRANK F. DROWOTA, III, Associate Justice, Supreme Court, JAMES M. SWIGGART and JOE C. LOSER, Jr., Retired Judges.

*MEMORANDUM OPINION*

JOE C. LOSER, Jr., Retired Judge.

This workers' compensation appeal has been referred to the Special Workers' Compensation Appeals Panel of the Supreme Court in accordance with Tenn.Code Ann. § 50-6-225(e)(3) for hearing and reporting to the Supreme Court of findings of fact and conclusions of law.

In this case, the employee questions the trial court's finding that she did not suffer an injury by accident on October 4, 1990, and the consequent denial of benefits. The Panel finds that the evidence preponderates against that finding and that the judgment should be reversed.

At the time of the trial on March 10, 1992, the employee, Judy L. Fink, was forty-four years old and had an eighth grade education, with no vocational training. She had worked as a waitress, as a furniture assembler and as an animal caretaker for the employer, June Caudle d/b/a Caudle Veterinary Clinic.

The employment relationship between the parties began in 1987. Mrs. Fink first injured her back in March, 1988. At the time, Mrs. Fink's average weekly wage was $170.00 per week. Her duties required bending, lifting and sometimes heavy lifting, stooping and a great deal of activity, such as retrieving large and small dogs, holding them for the veterinarian and emptying trash, going frequently up and down stairs between the work area and the basement. She saw Dr. Jerry Hunt on April 1, 1988 with pain in her low back and buttock and down her left leg into her ankle. After conservative care failed to relieve her symptoms, Dr. Hunt ordered a CT scan and lumbar myelogram, which confirmed a diagnosis of herniated disc at L,4–5 on the left side. On June 6, 1988, the doctor performed a partial laminectomy with excision of the herniated disc. Mrs. Fink reached maximum medical recovery in September, 1988 and returned to work without any restrictions and resumed doing the same work as before. Dr. Hunt did not make an impairment rating at that time, but, in his deposition testimony for the present case, which involved the October 4, 1990 injury, he testified that, his opinion would have been, if requested, that the claimant would have retained an impairment of at least eight percent of the whole person as a result of the March, 1988 injury. He was asked and answered as follows:

\* \* \*

Q. But, as a matter of definition, she would have retained a permanent partial impairment in correspondence with the AMA Guides as a result of that injury and surgery, is that correct?

A. Yes.

Q. And at a minimum, that impairment would have been eight percent of the whole person. Is that correct, sir?

A. Yes.

Q. And to your knowledge, sir, did she have any impairment in addition to that eight percent of the whole person after the first surgery?

A. Not to my knowledge.

Q. So the first surgery was, in fact, a surgically treated disc lesion with no residual symptoms?

A. That's correct.

Q. And she had a full range of motion after that. Is that correct, sir?

A. Yes.

\*     \*     \*

On October 18, 1988, Mrs. Fink and her employer's insurer, Firemans Fund Insurance Company, jointly petitioned the Second Circuit Court for Davidson County for approval of a settlement based upon temporary total disability benefits in the sum of $3,113.50 and permanent partial disability benefits in the sum of $9,067.20 based on twenty percent permanent, partial disability, for a total of $12,180.70 in disability benefits. As to medical benefits, the joint petition included the following:

> It is agreed that all medical, surgical and other benefits provided by the (Workers' Compensation) Act have been furnished by the employer and insurer in the amount of $8,547.98, and will close future medicals....

The judge of that court found the settlement to be a "compromise" of the employee's claim and "to the manifest best interest" of the employee. Permanent, partial disability benefits were paid to the claimant in a lump sum. It was averred in that petition, contrary to his present testimony, that Dr. Hunt "has advised that the (employee) will retain a 5% permanent partial impairment to the body as a whole" as a result of the March, 1988 injury. It appears that Mrs. Fink did not have the benefit of counsel in that case.

In June of 1989, the claimant injured her back again while lifting a dog from the floor to a table. For that injury she was treated by Dr. Vaughan Allen. Dr. Allen did not testify in the present case, but Mrs. Fink's uncontradicted testimony concerning her second injury was as follows:

\*     \*     \*

Q. What happened in June of 1989?

A. I was lifting a Chow dog, to get ready to clip him, from the floor, and I lifted him up to the table where I was to clip.

Q. Then what happened?

A. And I pulled the same thing in my back.

Q. Did you receive any treatment for your injuries?

A. Yes, sir. I went to Dr. Vaughan Allen; and I had to have tests run and all. He determined that I had to have surgery again.

Q. Was the surgery performed?

A. Yes, sir.

Q. Did you recover from those injuries?

A. Yes, sir.

Q. Did you go back to work at Caudle?

A. Yes, sir.

Q. Before October, 1990, what were you doing at Caudle Veterinary Clinic? What were your duties there?

A. Cleaning the runs, bathing the dogs, clipping the dogs. And they had us, once a week, helping the doctors upstairs during surgery.

Q. What would you do when you helped them in surgery?

A. Mostly I'd get the equipment ready for the surgery. I would scrub the dog down with the Betadine solution and, if they had to be clipped on the stomach, I would clip the dog's stomach.

Q. Had you recovered from your injuries from your two prior—or the two injuries? Had you recovered?

A. Yes, sir.

\*     \*     \*

The second injury, the one which occurred in June, 1989, prompted another joint petition to the Second Circuit Court for approval of a compromise settlement. This petition sought approval of payment in the sum of $4,538.76 for her temporary total disability of thirty-seven weeks and one day, of $15,900.00 for her permanent partial disability, which represented 109.1 weeks (approximately twenty-seven percent), and all medical expenses to January 10, 1990 plus six months. Any "further, other or additional claims for medical care" were waived by the employee. Upon a finding that Dr. Allen had estimated Mrs.

Fink's permanent, partial disability at ten percent to the body as a whole and that the settlement was in the best interest of the employee, the Judge approved the settlement and ordered that the employer was "forever released and discharged from any further liability of any sort whatsoever to [Mrs. Fink] on account of the accident, injuries, disabilities, medical expenses, aggravations of pre-existing conditions, changes in her condition, or otherwise." Again, Mrs. Fink was acting without the benefit of counsel, and apparently received a lump sum payment of permanent disability benefits.

On October 4, 1990, the claimant, while working for the employer, was lifting a forty to sixty pound bag of soiled newspapers from a can when she felt a sharp pain. Her uncontradicted testimony of the event was as follows:

\* \* \*

Q. What happened in October of 1990?

A. It was similar. I was lifting a garbage sack from a garbage can, but this time I leaned it downwards and I was pulling it out.

Q. What was in the garbage?

A. It was soiled newspapers and it was completely up to the top, because we had those 60 pound garbage bags that we generally filled to the top with soiled newspapers.

\* \* \*

Q. What happened? How did you injure yourself?

A. Well, when I pulled—I laid the garbage can downwards this time and I pulled the sack outwards, and that's when I felt the sharp pain in my back; and it ran down my left leg.

\* \* \*

She continued working that morning, but left shortly after noon with her supervisor's permission. As she was driving home, she again was struck by the same sharp pain. The next day she saw a doctor in Ashland City. That doctor suggested she return to Dr. Hunt, whereupon she notified her employer of her work related claim.

She saw Dr. Hunt on October 9, 1990, and gave the history as stated in her testimony. Dr. Hunt noted that she also had a sensation of numbness or tingling in her left leg. Again, Dr. Hunt began with conservative care. He ordered an MRI which showed some scarring at the level of previous surgery and extending to the lower level, with evidence of a bulge of the disc at the previous operative site. Dr. Hunt also ordered a myelogram, which was performed. It established a diagnosis of scarring in the neural canal outside the sac which holds the spinal cord and spinal fluid. This was at the lower level on the left side. Dr. Hunt was asked and he answered as follows:

\* \* \*

Q. Now, what was the significance of the scarring in this lower level, Dr. Hunt?

A. It carries a poor prognostic implication. Surgery ordinarily is to be avoided unless it becomes necessary.

Q. Okay. Was surgery necessary in this particular case?

A. As it turned out, it was. She developed cramping in her left leg and felt that it was worsening. She was pretty incapacitated. She was taking stronger medication than she had taken previously.

Q. What medication was that, Dr. Hunt?

A. She was taking Lortab, which is a semisynthetic narcotic. She requested—. Because of failure to improve over a period of three weeks; in fact, in the face of worsening, I agreed to perform another operation on her.

Q. And when was that other operation performed?

A. October the 31st, 1990.

Q. And what did you perform on October the 31st?

A. A total hemilectomy, which is complete removal of the bony covering of the spine on the left side at the two levels, four and five and S-one. I discovered entrapment of the nerve root which produced the radiculitis, or pain and cramping, that she had been experiencing.

I explored the L,4–5 level, which was the previous level of surgery, and explored the level below, which is the L–5, S–1 level, and here found the nerve root to be involved in scar tissue; and this scar tissue was excised or released.

The opening in the neural canal for the nerve roots to exit to go into the legs was widened to give as much room as possible for this entrapped nerve root. This was the extent of that surgery.

The surgery relieved the claimant's back pain but she had some residual headaches related to either or both the myelogram and the surgery. Her headaches lessened as time passed.

Dr. Hunt told Mrs. Fink that she would be unable to return to her former job or any similar job, that she should avoid any stooping, bending or lifting, especially repetitive stooping or bending, and that she should not lift more than twenty pounds or even that much in an awkward position or full flexion. The doctor estimated her permanent physical impairment at sixty percent of the spine, thirty-six percent to the whole body, using AMA Guidelines. He did say that she could do sedentary work such as office work, bench work or sales.

Although causation is not necessarily an issue before this Panel, we consider it appropriate, because of the employer's assertion that the employee's claim should be denied because it is the result of a mere episode of pain resulting from scar tissue which had accumulated as a result of two previous surgeries, did not constitute a new injury and did not advance the severity of her pre-existing condition, to point out Dr. Hunt's following testimony concerning medical causation:

\*       \*       \*

A. My opinion is the nerve root involved was entrapped with scar tissue and fibrosis that had developed following previous surgery so that there was no freedom of movement of the nerve root. And any stress placed upon the low back,—you anticipate that there's freedom of movement of the nerve rootlets normally—and if that nerve root is bound down, then the tissues that are binding it down do not stretch or give so that the stretching occurs to the nerve root.

And any irritation of the nerve root, whether it be pressure or restriction of its motion or being that it's bound down, evokes the paresthesia, which is numbness and tingling, and likely will cause radicular pain, which is pain that occurs in the low back but radiates or courses down the leg to some extent.

\*       \*       \*       \*       \*       \*

A. I think the trauma described of the patient having bent over and pulling and tugging on a forty pound bag of trash or any similar aggravation to the low back in a normal back, perhaps, would not have produced symptoms; but, with the scar tissue and binding down of the nerve root present, I feel that ... this trauma ... produced the symptamology.

\*       \*       \*       \*       \*       \*

A. I feel that activity she described, that she experienced immediate pain, did aggravate the scar tissue that was already present. It did cause a traction on the nerve root and that did produce the paresthesia and numb feelings and the pain; and that certainly was sufficient to aggravate and precipitate this dramatic worsening of her symptoms. . . .

\*       \*       \*       \*       \*       \*

A. The injury she described, in my opinion, directly produced the symptomalogy for which further examination was recommended and subsequently further surgery was accomplished.

Upon the above summarized evidence, the Trial Judge dismissed the Complaint for insufficient proof that there was an injury by accident. Appellate review is *de novo* upon the record of the trial court, accompanied by a presumption of the correctness of the findings of fact, unless the preponderance of the evidence is otherwise. Tenn.Code Ann. § 50–6–225(e)(2).

## FINDINGS AND CONCLUSIONS

Injury, as defined by the Tennessee Workers' Compensation Act, means an injury by accident arising out of and in the course of employment which causes either disablement or death of the employee.... Tenn.Code Ann. § 50–6–102(a)(5). If all three elements are present, the injury is compensable.

An injury by accident is one which cannot be reasonably anticipated, is unexpected and is precipitated by unusual combinations of fortuitous circumstances. *A.C. Lawrence Leather Co. v. Loveday*, 224 Tenn. 317, 455 S.W.2d 141 (1970). It is the resulting injury which must be unexpected in order for the injury to qualify as one by accident. *R.E. Butts Co. v. Powell*, 225 Tenn. 119, 463 S.W.2d 707 (1971). Injury includes whatever lesion or change in any part of the system that produces harm or pain or a lessened facility of the natural use of any bodily activity or capability. *Brown Shoe Co. v. Reed,* 209 Tenn. 106, 350 S.W.2d 65 (1961).

An accidental injury arises out of one's employment when there is apparent to the rational mind, upon a consideration of all the circumstances, a causal connection between the conditions under which the work is required to be performed and the resulting injury, *Hendrix v. Franklin State Bank*, 154 Tenn. 287, 290 S.W. 30 (1926), and occurs in the course of one's employment if it occurs while an employee is performing a duty he or she was employed to do. *Williams v. Preferred Development Corp.*, 224 Tenn. 174, 452 S.W.2d 344 (1970).

Additionally, an injury is compensable, even though the claimant may have been suffering from a serious pre-existing condition or disability, if a work connected accident can be fairly said to be a contributing cause of such injury. An employer takes an employee as he is and assumes the risk of having a weakened condition aggravated by an injury which might not affect a normal person. *Harlan v. McClellan*, 572 S.W.2d 641 (Tenn.1978); *Modern Upholstered Chair Co. v. Russell*, 518 S.W.2d 519 (Tenn.1974); *Thomas v. Aetna Life and Casualty Co.*, 812 S.W.2d 278 (Tenn.1991); *White v. Werthan Industries*, 824 S.W.2d 158 (Tenn.1992).

The employer argues that this claim was properly rejected and that the trial court should be affirmed based on the principles asserted in *Boling v. Raytheon Co.*, 223 Tenn. 528, 448 S.W.2d 405 (1969), *Smith v. Smith's Transfer Corp.*, 735 S.W.2d 221 (Tenn.1987) and their progeny.

In *Boling* the Supreme Court distinguished the facts from those in *Brown Shoe Co. v. Reed* by finding that the employee's pain was caused by cervical neuritis, secondary to degenerative arthritis, aggravated by posture and tension. In the present case, there was no evidence of neuritis or arthritis. The claimant testified, and her doctor confirmed, without contradiction, that she was rehabilitated from her two prior injuries and that her x-rays before surgery showed "a mild spinal curvature to the left side and some flattening of the usual spinal curve from the side view."

In *Smith v. Smith's Transfer*, the Supreme Court found that the employee's work aggravated her pre-existing condition by making the pain worse but did not advance the severity of her thoracic outlet syndrome or result in any other disabling condition.

Both *Boling* and *Smith* were gradual injury claims in which the claimant's were unable to establish a date of injury. *See Central Motor Express v. Burney*, 214 Tenn. 118, 377 S.W.2d 947 (1964).

We find, particularly from the uncontradicted medical proof but supported by Mrs. Fink's own uncontradicted testimony, that she did suffer a compensable injury by accident on October 4, 1990, as claimed. It arose out of the employment, occurred in the course of employment and caused disablement. In fact, if we accept statements contained in the two previous petitions, which were accepted by a court of competent jurisdiction, and reject the testimony of the claimant that she had completely recovered from those injuries, her percentage of physical impairment has increased to the body as a whole, to either thirty-six percent or sixty percent to the body as a whole, according to the uncontradicted medical proof. Moreover, the injury produced not only "harm or pain or lessened facility of the natural use of any bodily activity or capability," but all of the above; and it did, in the Panel's opinion of the evidence, advance the severity of her pre-existing condition.

█ A question remains, though the appellees have wisely declined to argue it, as to the validity of the release agreement between the parties following the employee's June, 1989 injury. Employers are prohibited by law from making any agreement, contract, rule, regulation or other device which would operate to extinguish or reduce its obligations under the Workers' Compensation Law. Tenn.Code Ann. § 50–6–114. That agreement, to the extent that it is intended to defeat the present claim, violates public policy and is unenforceable.

█ The record includes the testimony of Susan Dupree Nichols, a vocational evaluator, who testified as an expert on vocational disability. She opined, after carefully testing and examining Mrs. Fink, that Mrs. Fink had a 47.72 percent "loss of access."

From a consideration of her age, job skills, education, training, and anatomical impairment, and the lack of job opportunities for her, the Panel finds that the claimant will retain a permanent industrial disability of seventy-five percent to the body as a whole.

We conclude that Mrs. Fink should recover temporary, total disability benefits from October 4, 1990 until the date she reached maximum medical improvement, permanent partial disability benefits for an additional three hundred weeks, and all medical and hospital care which is reasonably necessary on account of her injury, all as required by the Act and subject to the limitations contained in the Act.

█ Mrs. Fink has now been awarded permanent disability benefits totalling one hundred twenty-two percent to the body as a whole, thereby engaging the following provisions of Tenn.Code Ann. § 50–6–208:

\* \* \*

(b)(1)(A) In cases where the injured employee has received or will receive a workers' compensation award or awards for permanent disability to the body as a whole, and the combination of such awards equals or exceeds one hundred percent (100%) permanent disability to the body as a whole, the employee shall not be entitled to receive from the employer or its insurance carrier any compensation for permanent disability to the body as a whole that would be in excess of one hundred percent (100%) permanent disability to the body as a whole, after combining awards.

(B) Benefits which may be due the employee for permanent disability to the body as a whole in excess of one hundred percent (100%) permanent disability to the body as a whole, after combining awards, shall be paid by the second injury fund.

\* \* \*

█ All disability benefits, except those which have accrued, shall be paid periodically, because the Panel is not persuaded that Mrs. Fink is capable of wisely managing a lump sum award. In accordance with Tenn.Code Ann. § 50–6–208(b)(1), the em-

ployer's insurer is liable for all unpaid temporary, total disability benefits and fifty-three percent of permanent disability benefits; and the second injury fund is liable for the final and remaining twenty-two percent of permanent disability benefits. *See Burris v. Cross Mountain Coal Co.*, 798 S.W.2d 746 (Tenn.1990); *Sims v. Bituminous Cas. Corp.*, 798 S.W.2d 751 (Tenn. 1990).

Since the record on appeal does not disclose the employee's compensation rate or the date on which she reached maximum medical improvement from the injury in question, the case is remanded to the trial court for entry of a judgment in accordance with this memorandum opinion, for which purpose additional proof may be taken, if necessary. Costs on appeal are taxed ½ to the employer and its insurer and ½ to the Second Injury Fund. *See Reagan v. American Policyholders' Ins.*, 842 S.W.2d 249 (Tenn.1992).

FRANK F. DROWOTA, III, Associate Justice, and JAMES M. SWIGGART, Retired Judge, concur.