IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
December 2, 2020 Session

## MICHAEL KEVIN UPCHURCH v. SULLIVAN COUNTY DEPARTMENT OF EDUCATION

**Appeal from the Circuit Court for Sullivan County**
**No. C42530   John S. McLellan, III, Judge**

_____

### No. E2019-01071-COA-R3-CV

_____

A vocational teacher sued his former employer, a county department of education, alleging that the department's intentional failure to remediate mold contamination at the high school where he taught caused him to suffer long-term detrimental health effects and emotional distress.  The trial court dismissed the teacher's claims pursuant to Tennessee Rule of Civil Procedure 12.02(6), finding that the Tennessee Workers' Compensation Law, Tennessee Code Annotated section 50-6-101 et seq., provided the exclusive remedy for the acts alleged in the complaint and that the allegations therein failed to state a claim upon which relief can be granted under the statutory framework.  Upon our review of the pleadings, we affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed; Case Remanded**

KRISTI M. DAVIS, J., delivered the opinion of the court, in which JOHN W. MCCLARTY and THOMAS R. FRIERSON, II, JJ., joined.

Michael Kevin Upchurch, Kingsport, Tennessee, Pro Se.[1]

Daniel P. Street, Blountville, Tennessee, for the appellee, Sullivan County Department of Education.

---

[1] Upchurch's counsel on appeal, who also represented him before the trial court, was placed on temporary suspension from the practice of law after this appeal was filed.  *See In re: Kyle Douglas Vaughan, BPR #032416*, No. M2020-00100-SC-BAR-BP (Tenn. Jan. 21, 2020) (order).  Consequently, this Court removed Mr. Vaughan as Upchurch's counsel of record and gave Upchurch thirty days to obtain new counsel.  *Upchurch v. Sullivan Cnty. Dep't of Educ.*, No. E2019-01071-COA-R3-CV (Tenn. Ct. App. Feb. 25, 2020) (order).  Upchurch did not obtain new counsel.

# OPINION

## Background

On February 19, 2019, Michael Kevin Upchurch ("Upchurch") filed a complaint against his former employer, the Sullivan County Department of Education ("SCDE"), in the Circuit Court for Sullivan County (the "trial court"). Upchurch asserted four separate causes of action: (1) Public Policy: Intentional Failure to Remediate Contamination of Property; (2) Public Policy: Intentional Concealment of Biohazardous Exposure; (3) Fraud: Intentional Misrepresentation; and (4) Intentional Infliction of Emotional Distress. The complaint contains the following allegations relevant to Upchurch's claims:

9. Plaintiff was an employee of the SCDE working in the capacity of a full-time vocational teacher at Sullivan North High School for school years 2017-2018 and 2018-2019 . . . .

10. During the week of January 7, 2018, Plaintiff was moved to an upstairs classroom which had been closed and unused since May 2017.

11. By the following week, the Plaintiff had grown ill with a fever of 103.7 degrees Fahrenheit with flu-like symptoms and a rash covering Plaintiff's chest and armpits.

12. Plaintiff took four (4) days off from work during which time Plaintiff's fever dissipated.

13. Upon returning to work, Plaintiff became severely ill once again with flu-like symptoms which perpetually lingered.

. . . .

15. On February 21, 2018, Plaintiff was moving resources from classroom 1058 across the hall to his classroom when Plaintiff observed what looked to be mold on books.

16. During the Plaintiffs planning period on the same date, Plaintiff lifted a ceiling tile in one of the upstairs classrooms and discovered Stachybotrys ("Toxic Black Mold") growing above the drop ceiling ranging from six (6) feet to ten (10) feet in height with Toxic Black Mold reaching to the roofline. The steel support beams were coated in white mold which is known to grow in the presence of Toxic Black

Mold.

. . . .

18. Plaintiff reported the Toxic Black Mold findings to the principal at the time, . . . who assured the Plaintiff the Toxic Black Mold would be "taken care of."

19. Two SCDE Maintenance Department employees entered the back-shop area approximately forty-five (45) minutes later. The maintenance employees asked Plaintiff where the mold was located and Plaintiff advised them of the location.

. . . .

21. By the end of day on February 21, 2018, Plaintiff was informed the material Plaintiff observed on the books was not mold, but fingerprint dust from the criminal justice class. When Plaintiff asked about the Toxic Black Mold above the ceiling tiles, the maintenance worker ignored Plaintiff's inquiry and left the school.

22. On February 22, 2018, Plaintiff took his camera to the school and began documenting the Toxic Black Mold findings.

23. Plaintiff also removed a ceiling tile just outside Plaintiff's classroom, Room 1058, to have a physical sample tested for Toxic Black Mold.

. . . .

26. [SCDE's superintendent of maintenance] informed Plaintiff that there was no mold to worry about and the "school roof leaked the thirty (30) years he . . . taught there and he . . . never got sick." Plaintiff was flabbergasted at [the] admission to knowledge of structural issues leading to water damage that could promote mold growth as well as [the] failure to act to resolve the issue in the four (4) years [he] has been the superintendent of maintenance for SCDE.

27. On February 24, 2018, Plaintiff sought medical treatment from the emergency room at Johnson City Medical Center where Plaintiff was diagnosed with a compromised immune system, congestion around his heart, and hyperinflated lungs from either a fungal or viral infection.

28. When Plaintiff returned to the school the following Monday morning to prepare the substitute teacher, Plaintiff observed SCDE maintenance employees had removed and began replacing discolored ceiling tiles in the upstairs classrooms . . . .

29. Plaintiff began his prescribed week off work and began a regimen of steroids and antibiotics, but by Wednesday Plaintiff was experiencing the following symptoms: sneezing, itching skin, skin irritation, watery eyes, itching eyes, constant headaches, depression, nose bleeds, constant fatigue, trouble breathing, coughing up 6-8 ounces daily of black debris, nausea, diarrhea, vomiting, loss of appetite, weight loss, hair loss, bloody stool, short term memory loss, pain in his joints and muscles, swollen glands in in his neck and armpits, body shakes, heart palpitations, coughing up blood, blurred vision, and insomnia.

30. On March 3, 2018, the Plaintiff once again went to the emergency room at Johnson City Medical Center. Upon examination, the attending physician informed Plaintiff that while Plaintiff's blood counts had marginally improved, it appeared that Plaintiff was still suffering from some form of an allergy and was most likely fungally related. Plaintiff was prescribed over the counter allergy medications and an inhaler to assist with Plaintiffs breathing difficulties.

31. Plaintiff returned to work on March 5, 2018.

32. On March 12, 2018, Plaintiff awoke unable to speak due to Plaintiff's throat being covered in blisters and went the emergency room at Johnson City Medical Center for the third time in less than a month. Plaintiff was instructed to have a follow up appointment with a primary care physician and pulmonologist. The emergency room physician also advised Plaintiff to limit his exposure to any allergens.

33. On March 13, 2018, Plaintiff returned to work and met with his direct supervisor. Plaintiff informed his supervisor of the Toxic Black Mold infestation and stated Plaintiff was afraid to file a Worker's Compensation claim because Plaintiff was in fear of being "blacklisted."

34. During the Plaintiff's meeting with his supervisor, Plaintiff observed SCDE maintenance workers in the upstairs classrooms emptying the classrooms, replacing discolored ceiling tiles, tearing out the carpets, throwing away all books and furniture thereby destroying evidence

- 4 -

and attempting to cover up any visible signs of the Toxic Black Mold infestation.

35. On March 15, 2018, the Plaintiff went to his first appointment with Plaintiff's primary care physician. Upon reviewing the Plaintiff's blood work abnormalities from Plaintiff's emergency room visits, Plaintiff's physician immediately referred him to an allergist and pulmonologist.

36. On March 19, 2018, Plaintiff personally drove the tile he removed from outside classroom 1058 on February 22, 2018 to Southeastern Environmental Microbiology Laboratories in Greenville, South Carolina. This lab is the premier asbestos and mold testing laboratory on the East Coast as they specialize only in asbestos and mold testing.

37. Upon testing the physical sample taken from the ceiling tile removed from Sullivan North High School, it was confirmed to have medium levels of Toxic Black Mold.

. . . .

39. The laboratory informed Plaintiff that there is a zero-tolerance for Toxic Black Mold and it was good the Plaintiff brought a physical sample as Toxic Black Mold grows indoors and cannot be detected on air quality tests unless it is physically disturbed and becomes airborne. The laboratory stated that "whatever building the ceiling tile came out of needs to be demolished immediately."

40. Plaintiff reported to SCDE main office on March 26, 2018, to ascertain if there was any help SCDE could provide the Plaintiff regarding the Toxic Black Mold infestation and its effect on his health. SCDE also made copies of the laboratory mold test report.

41. The following day, Plaintiff was instructed to take medical leave and file a Worker's Compensation claim.

42. Plaintiff filed his medical leave and Worker's Compensation claim paperwork as instructed and also filed a claim for short-term disability through an additional policy Plaintiff carried through his school insurance.

43. Plaintiff's physician ordered Plaintiff to take a medical leave until the end of May 2018 at which time Plaintiff would require further

evaluation.

44. Specifically, Plaintiff's Certification of Health Care Provider for Employee's Serious Health Condition (Family and Medical Leave Act) that was completed by Plaintiff's physician, and filed with SCDE, reads, "Flares and disease progression and quantity will all depend on exposure to mold. If no more mold is in the building or around Michael, he will recover and have no more flares."

45. Plaintiff also completed a SCDE Administrative Form 3.602.F2 "Employee's First Report of Work Injury or Illness" on March 28, 2018. In this report, Plaintiff described how his illness occurred as, "I was moved to upstairs classroom with temp. of 80 degrees Fahrenheit and humidity of 67% on thermostat and Toxic Black Mold growing in ceiling above. I soon became ill and was in and out of emergency room until I located a PCP."

. . . .

47. On April 2, 2018, SCDE contracted with Wingfield Environmental ("Wingfield") to complete an air mold sample of Sullivan North High School, specifically an air sample of classroom 1058 and the corridor immediately outside classroom 1058.

48. These air samples were submitted to SanAir Technologies Laboratory ("'SanAir") by Wingfield on April 3, 2018 for testing. No evidence of Toxic Black Mold was found in the air samples submitted.

49. However, SanAir's organism library specifically states that Stachybotrys, Toxic Black Mold:

> ...is usually difficult to find in indoor air samples unless it is physically disturbed because the spores are in a gelatinous mass...It proliferates in the indoor environment with long term water damage, growing on wallpaper, gypsum board, and textiles. As a general rule, air cultures for Stachybotrys yields unpredictable results, mainly due to the fact that this fungus is usually accompanied by other fungi such as Aspergillus and Penicillium that normally are better aerosolized than Stachybotrys.

- 6 -

50. Wingfield's letter to SCDE on April 4, 2018 explaining the lack of Toxic Black Mold in the air samples collected even states:

> Please be aware that although a reasonable attempt has been made to locate suspect fungi (mold) in the structure, the inspection techniques used are inherently limited in the sense that only full demolition procedures will reveal all materials of a structure, and therefore, all areas of potential mold growth. As such, unidentified microbial (mold) growth may be located within **walls, ceilings, cavities, below flooring or grade, and other non-accessible areas that were not identified by the current sampling efforts. (*emphasis added*)**

By Wingfield's own admission, the air sample collected could not account for Toxic Black Mold growth in the ceiling areas specifically pointed out by the Plaintiff to SCDE.

51. On April 4, 2018, Plaintiff was confirmed to have a mold allergy by The Allergy, Asthma, & Sinus Center, specifically Dr. Phillip W. Jones, and pulmonologist.

52. During Plaintiff's medical leave, fellow teachers and school administration made false statements about the Plaintiff including "he was sick before he came to the school," "he got the mold samples from somewhere else," and "he's just doing this for money."

53. In June 2018, Plaintiff's Worker's Compensation claim, short-term disability, and supplemental short-term disability was denied because Wingfield Environmental air sample of the building found no spores of Toxic Black Mold.

54. Upon receiving the denial of Plaintiff's Worker's Compensation claim, short-term disability, and supplemental short-term disability based upon the air samples conducted by Wingfield, Plaintiff reached out to Wingfield via telephone.

55. Plaintiff inquired if Wingfield could test the physical sample acquired by the Plaintiff from Sullivan North High School. Wingfield stated, "they were not a laboratory and could not test any physical mold samples." Wingfield further stated they only conducted air quality tests and were not even sure where the closest laboratory was to

conduct a physical test.

56. The following week, Plaintiff received a letter from SCDE offering the Plaintiff another contract year as a vocational instructor for the school year 2018-2019.

57. Plaintiff accepted the contract with the assurance by the SCDE there was no Toxic Black Mold present per the SCDE testing.

. . . .

59. Upon the 2018-2019 school year beginning in August 2018, Plaintiff immediately noticed the temperature school-wide was much cooler, the entire school had been repainted inside, and all the old ceiling tiles had been replaced with new ones.

60. Upon receiving Plaintiff's new classroom assignment, Plaintiff immediately noticed he had been assigned to a room where no ceiling tiles had been replaced and was the moldiest room in the entire school.

61. Upon advising the new principal . . . that Plaintiff has a mold allergy and cannot be exposed to mold, Plaintiff was informed by [the new principal] that there was "no mold, just water damage" to the ceiling tiles.

62. Plaintiff pointed out a ceiling tile with finger-like growths on it, a telltale sign of mold, and informed [the new principal] that Plaintiff would be relocating to the vocational shop due to the obvious presence of mold.

63. Plaintiff chose to relocate to the vocational shop which had no air conditioning and a temperature of 85 degrees Fahrenheit in an attempt to remove himself from presence of Toxic Black Mold.

64. From the beginning of the school year, Plaintiff's health progressively declined yet again.

. . . .

66. On February 2, 2019, the Plaintiff found himself hospitalized again with sharp chest pain when laying down, elevated blood pressure and elevated heart rate. Plaintiff's blood testing revealed a high level of

monocytes1 and absolute monocytes.

67. On February 5, 2019, Plaintiff met with [the new principal] regarding Plaintiff's health declining again and [the new principal] immediately exclaimed, "Whoa, there's no mold in this building! We had it tested! If you're a disgruntled employee, you need to go talk to the superintendent."

68. Plaintiff explained the Toxic Black Mold infestation to [the new principal], who continued to deny the infestation. Yet, by the end of the day, SCDE maintenance workers were once again a hive of activity exchanging discolored ceiling tiles for new ceiling tiles in an attempt to hide any Toxic Black Mold.

69. On February 6, 2019, Plaintiff took a sick day due to his health deteriorating.

70. On February 7, 2019, parts of Sullivan North High School had flooded due to the rain and SCDE maintenance workers were present tearing out brand new ceiling tiles that had buckled and busted due to water, trash cans catching water from the roof, and attempting to stop the roof leaks.

71. Plaintiff showed a PowerPoint presentation to his construction class regarding Building Safety: Asbestos and Toxic Black Mold as part of the curriculum. Every picture in the presentation regarding Toxic Black Mold were pictures taken by the Plaintiff of the infestation at Sullivan North High School. An assistant principal appeared in the Plaintiff's class and became aware of the presentation being done.

72. During Plaintiff's lunch period, two Sullivan County Sheriff's Office deputies and an assistant principal for Sullivan North High School presented themselves to the Plaintiff and stated the superintendent of schools . . . wanted to see the Plaintiff in one of the offices.

73. While walking towards the office, Plaintiff stated Plaintiff knew how infested the building was with Toxic Black Mold where [the superintended of schools] wanted to meet with Plaintiff and that if [she] wanted to speak with Plaintiff, [she] could come to his shop.

74. Upon Plaintiff mentioning the Toxic Black Mold infestation in the hallway, an assistant principal immediately exclaimed, where all students and staff present could hear, "Whoa, there's no mold in here!

We've had it tested!" Plaintiff shook his head in disbelief and returned to his shop.

75. [The superintendent of schools] came to Plaintiff's shop with [the former principal]. [The superintendent of schools] asks, "Mr. Upchurch, what is the problem?" Plaintiff proceeds to explain, again, about the Toxic Black Mold infestation. Plaintiff explained that [the former principal] was made aware the previous year of the infestation and had done nothing to remediate the problem.

76. [The superintendent of schools] requested for Plaintiff to turn over his PowerPoint presentation about asbestos and Toxic Black Mold to [the new principal], which Plaintiff refused to do.

77. Plaintiff inquired what was necessary for him to end his employment with SCDE due to SCDE intentional failure to remediate the Toxic Black Mold infestation.

78. Plaintiff left the premises and as soon as Plaintiff left the school parking lot, a Sullivan County Sheriff's Office deputy followed the Plaintiff all the way to Plaintiff's exit.

79. After Plaintiff's departure, the students heard other teachers and school administration state that Plaintiff was "a liar," "sick before he came to the school," and "a son of a bitch" and the students relayed the same information to the Plaintiff.

80. On February 13, 2019, Plaintiff personally delivered two (2) samples to Assured Bio Labs, LLC ("Assured Bio") in Oak Ridge, Tennessee for physical testing. The first sample was the ceiling tile from the school year 2017-2018, which has been preserved by the Plaintiff, and the second sample was a ceiling tile collected during the 2018-2019 school year.

81. Both ceiling tile samples tested positive for medium levels of Toxic Black Mold.

82. Assured Bio states the following about Stachybotrys, Toxic Black Mold:
> Conditions for growth include areas subject to temperature fluctuations that also have a relative humidity above 55%. The pathology to human exposure

may include allergies, dermatitis, cough, rhinitis, nose bleeds, cold and flu symptoms, headache, general malaise and fever, and diarrhea. It produces mycotoxins which are extremely potent. Toxins produced by the fungus may suppress the immune system-affecting lymphoid tissue and the bone marrow. Exposure via inhalation, ingestion, or dermal/skin should be avoided.

83. On February 13, 2019, a school wide voice message and text message was sent to all Sullivan North Middle and High School parents from [the new principal] stating the school would be closed on Thursday, February 14, 2019, and Friday, February 15, 2019, due to four (4) areas testing positive for low levels of Toxic Black Mold spores through an air sample conducted by Wingfield.

. . . .

85. SCDE's intentional recklessness continues even following the acknowledgment of the presence of Toxic Black Mold as the Watauga Valley District Conference Tournament was held at Sullivan North High School less than forty-eight (48) hours after the parents and staff were notified that school would be canceled for mold remediation. In fact, the tournament began on Friday, February 15, 2019 which was one of the days school was canceled and set aside for mold remediation work. The tournament continued throughout the weekend prior to any re-testing results being received by SCDE thereby continuing to expose the unknowing regional general public to a toxic environment.

Upchurch sought $3 million in compensatory damages and $18 million in punitive damages, alleging that SCDE's conduct was "outrageous and intentional from the outset" and "repugnant and beyond comprehension as acceptable in any civilized society."

SCDE moved to dismiss the complaint in its entirety pursuant to Tennessee Rule of Civil Procedure 12.02(6).[2] SCDE argued that Upchurch's claims should be dismissed because the Tennessee Workers' Compensation Law provides the exclusive remedy for the acts alleged in the complaint. SCDE also argued that the exception to the Workers' Compensation Law's exclusivity provision did not apply because Upchurch did not allege facts showing that SCDE "actually intended to injure" him. In the alternative, SCDE

---

[2] Rule 12.02(6) permits defendants to file a motion to dismiss a plaintiff's claim for "failure to state a claim upon which relief can be granted." Tenn. R. Civ. P. 12.02(6).

asserted that it was immune from liability under the Tennessee Governmental Tort Liability Act ("the GTLA"), Tennessee Code Annotated section 29-20-101 et seq., because the GTLA does not waive immunity for the intentional torts alleged in the complaint.[3] Upchurch objected to SCDE's motion, asserting that the "intentional torts" he alleged were not subject to either statute.

On May 17, 2019, the trial court granted SCDE's motion and dismissed the case, concluding that the Workers' Compensation Law provided the exclusive remedy for the allegations in the complaint and that the complaint did not seek relief under that statute. Although it recognized a narrow exception to the Workers' Compensation Law's exclusivity provision, the trial court found the exception inapplicable because Upchurch did not allege that SCDE "actually intended to injure [him]." The trial court also concluded that the complaint "states no claim under [the GTLA]." On October 21, 2019, the trial court dismissed—for failure to prosecute—Upchurch's motion for relief of judgment and reconsideration, which he had filed over four months earlier on June 17, 2019. Upchurch timely appealed the dismissal of his claims.

## Issues Presented

We restate and rearrange the issues raised by Upchurch as follows:[4]

1.      Whether the trial court erred in dismissing his complaint for failure to state a claim upon which relief can be granted based on the exclusivity provision of the Tennessee Workers' Compensation Law.

2.      Whether SCDE's intentional acts fall under the exception to the Workers' Compensation Law exclusivity provision.

3.      Whether SCDE's intentional acts are limited by the Tennessee Governmental Tort Liability Act.

## Standard of Review

The standard of review applicable to a trial court's ruling on a motion to dismiss

---

[3] Although SCDE stated in its motion that Upchurch may have stated a claim under the GTLA for "Injury from Dangerous Structures," *see* Tenn. Code Ann. § 29-20-204(a), such claim is neither apparent from the face of the complaint nor raised by Upchurch in this appeal.

[4] Upchurch also raised a fourth issue: "Can I received Due process?" Our reading of Upchurch's appellate brief leaves no doubt that this "issue" only challenges the trial court's ruling. The brief states: "I would like this Honorable Court . . . to restore my faith in our States [sic] Justice System by granting me Due Process . . . and overturn District [sic] Court's ruling . . . ." This issue is therefore subsumed under our overarching review of the trial court's grant of SCDE's motion to dismiss.

based on Rule 12.02(6) of the Tennessee Rules of Civil Procedure is de novo, with no presumption of correctness. *Phillips v. Montgomery Cnty.*, 442 S.W.3d 233, 237 (Tenn. 2014). A Rule 12.02(6) motion to dismiss challenges only the legal sufficiency of the complaint, not the strength of the plaintiff's proof or evidence. *Webb v. Nashville Area Habitat for Humanity, Inc.*, 346 S.W.3d 422, 426 (Tenn. 2011). Such motion "'admits the truth of all of the relevant and material allegations contained in the complaint, but . . . asserts that the allegations fail to establish a cause of action.'" *Brown v. Tenn. Title Loans, Inc.*, 328 S.W.3d 850, 854 (Tenn. 2010) (quoting *Freeman Indus., LLC v. Eastman Chem. Co.*, 172 S.W.3d 512, 516 (Tenn. 2005)). Thus, the trial court's ruling must be based on its examination of the pleadings alone. *Webb*, 346 S.W.3d at 426. Moreover, the trial court "must construe the complaint liberally, presuming all factual allegations to be true and giving the plaintiff the benefit of all reasonable inferences." *Tigg v. Pirelli Tire Corp.*, 232 S.W.3d 28, 31–32 (Tenn. 2007). However, for a complaint to survive a motion to dismiss, "[t]he facts pleaded, and the inferences reasonably drawn from these facts, must raise the pleader's right to relief beyond the speculative level." *Abshure v. Methodist Healthcare– Memphis Hosps.*, 325 S.W.3d 98, 104 (Tenn. 2010). "[C]ourts are not required to accept as true assertions that are merely legal arguments or 'legal conclusions' couched as facts." *Webb*, 346 S.W.3d at 427 (citation omitted).

## Analysis

The trial court dismissed the complaint based on the exclusivity provision of the Workers' Compensation Law, Tennessee Code Annotated section 50-6-108(a) (2014), which SCDE raised as an affirmative defense in its Rule 12.02(6) motion to dismiss. Tennessee Rule of Civil Procedure 8.03 lists "workers' compensation immunity" as an affirmative defense. Tenn. R. Civ. P. 8.03. Our Supreme Court has held:

> A complaint is subject to dismissal under rule 12.02(6) for failure to state a claim if an affirmative defense clearly and unequivocally appears on the face of the complaint. It is not necessary for the defendant to submit evidence in support of his motion when the facts on which he relies to defeat plaintiff's claim are admitted by the plaintiff in his complaint.

*Anthony v. Tidwell*, 560 S.W.2d 908, 909 (Tenn. 1977) (citations omitted); *see also King v. Bank of Am., N.A.*, No. W2018-01177-COA-R3-CV, 2020 WL 7861368, at *5 (Tenn. Ct. App. Dec. 29, 2020); *Stephens v. Home Depot U.S.A., Inc.*, 529 S.W.3d 63, 72 (Tenn. Ct. App. 2016). "In other words, the plaintiff's own allegations in the complaint must show that an affirmative defense exists and that this defense legally defeats the claim for relief." *Jackson v. Smith*, 387 S.W.3d 486, 491–92 (Tenn. 2012) (citations and footnote omitted).

As a threshold issue, we first examine the complaint's factual allegations to determine whether Upchurch is precluded from asserting claims outside the statutory

framework provided by the Workers' Compensation Law.

**I.**

Under the Tennessee Workers' Compensation Law,

> The rights and remedies herein granted to an employee subject to the Workers' Compensation Law on account of personal injury or death by accident, including a minor whether lawfully or unlawfully employed, shall exclude all other rights and remedies of such employee, such employee's personal representative, dependents or next of kin, at common law or otherwise, on account of such injury or death.

Tenn. Code Ann. § 50-6-108(a). Our Supreme Court "has interpreted this statutory section as mandating that workers' compensation be considered 'the exclusive remedy for an employee who is injured during the course and scope of his employment, meaning the employee is precluded from seeking tort damages for the injury.'" *Byrd v. Appalachian Elec. Coop.*, No. E2017-01345-COA-R3-CV, 2018 WL 1953206, at \*4 (Tenn. Ct. App. Apr. 25, 2018) (quoting *Valencia v. Freeland & Lemm Const. Co.*, 108 S.W.3d 239, 242 (Tenn. 2003)); *see also Clawson v. Burrow*, 250 S.W.3d 59, 62 (Tenn. Ct. App. 2007) ("The exclusivity provision is triggered when an employee suffers an injury arising out of and in the course and scope of employment."). An injury occurs during the course and scope of employment "if it takes place while the employee is performing a duty he or she is employed to perform." *Foreman v. Automatic Sys., Inc.*, 272 S.W.3d 560, 571 (Tenn. 2008) (citing *Fink v. Caudle*, 856 S.W.2d 952, 958 (Tenn. 1993)). That is to say, the phrase "course of employment" refers to the "time, place, and circumstances of the injury." *Wilhelm v. Krogers*, 235 S.W.3d 122, 127 (Tenn. 2007). An injury arises out of employment "when there is a causal connection between the conditions under which the work is required to be performed and the resulting injury." *Foreman*, 272 S.W.3d at 571–72 (citing *Fritts v. Safety Nat'l Cas. Corp.*, 163 S.W.3d 673, 678 (Tenn. 2005)). The employee must have been injured "from a danger or hazard peculiar to the work or . . . by a risk inherent in the nature of the work." *Foreman*, 272 S.W.3d at 572 (citing *Thornton v. RCA Serv. Co.*, 221 S.W.2d 954, 955 (Tenn. 1949)). Consequently, we turn to determine whether Upchurch alleged that he was injured out of and during the course and scope of his employment with SCDE.

Upchurch alleges in his complaint that he developed multiple health issues from exposure to mold at Sullivan North High School, which resulted in emergency room visits in February and March 2018. He alleges that he first experienced "flu-like symptoms and a rash covering [his] chest and armpits" in January 2018 while employed by SCDE as a full-time vocational teacher. These symptoms appeared approximately a week after he "was moved to an upstairs classroom which had been closed and unused since May 2017."

In February 2018, Upchurch alleges he discovered toxic black mold growing above the drop ceiling in a nearby classroom after removing a ceiling tile. He says he notified SCDE of these findings, but SCDE failed to remediate the problem. According to the complaint, a mold testing laboratory in Greeneville, South Carolina confirmed that a physical sample from the ceiling tile had medium levels of toxic black mold. Upchurch completed an "Employee's First Report of Work Injury or Illness" in late March 2018, in which he stated: "I was moved to upstairs classroom with temp. of 80 degrees Fahrenheit and humidity of 67% on thermostat and Toxic Black Mold growing in ceiling above. I soon became ill and was in and out of emergency room until I located a PCP." Upchurch contend that in April 2018, a pulmonologist confirmed his mold allergy. He alleges that he accepted a contract to return as a vocational instructor for the school year 2018-2019 "with the assurance by the SCDE there was no Toxic Black Mold present per the SCDE testing." However, he claims that he was reassigned to "the moldiest room in the entire school" and that his health deteriorated from the beginning of the school year, necessitating a third visit to the emergency room in February 2019. He contends that a physical sample from a ceiling tile collected during the new school year tested positive for medium levels of toxic black mold.

Taking the complaint's allegations as true, as we must, we conclude that the injuries alleged by Upchurch arose out of and during the course and scope of his employment with SCDE. Upchurch alleges injuries that are causally connected to his exposure to toxic black mold while performing the duties for which SCDE employed him. Therefore, the Workers' Compensation Law provides the exclusive remedy for his injuries and precludes him from seeking compensation under tort law. *See Byrd*, 2018 WL 1953206, at *4.

Although we have determined that Upchurch may not assert claims under tort law for his work-related injuries, we address directly his claim for intentional infliction of emotional distress. This Court has previously upheld the dismissal of this type of claim pursuant to the exclusivity provision of the Workers' Compensation Law. *See, e.g.*, *Byrd*, 2018 WL 1953206, at *2–3; *Federated Rural Elec. Ins. Exch. v. Hill*, No. M2005-02461-COA-R3CV, 2007 WL 907717, at *9 (Tenn. Ct. App. Mar. 26, 2007). In *Byrd*, an employee alleged intentional infliction of emotional distress after experiencing "chest pain, shortness of breath, anxiety, and other symptoms," following a three-hour meeting with his manager to discuss a possible violation of company policy. 2018 WL 1953206, at *1. This Court affirmed the trial court's grant of the employer's motion to dismiss the claim under "'the exclusive remedy provision for workers' compensation.'" *Id.* at *3 (citing the trial court's order dismissing the complaint). Here, Upchurch alleges that SCDE intentionally and recklessly exposed him to toxic black mold, caused a school resource officer to follow him the day he resigned from school, and engaged in a smear campaign to scandalize his character, reputation, and standing in the community. He further alleges that these actions put him in fear for his safety and freedom and caused him great mental distress, anxiety, depression, a loss of enjoyment of life due to his sudden and unexpected change in economic circumstances. These alleged actions are connected to his employment with

SCDE both causally and in terms of time, place, and circumstance. They occurred almost entirely on school grounds, during school hours, and—in any case—had their genesis in the employment relationship. The alleged emotional distress arose out of and in the course of his employment with and dismissal from SCDE. Dismissal of this tort claim is appropriate under the exclusive remedy provision of the Workers' Compensation Law.

## II.

As the trial court noted, Tennessee courts have long recognized an exception to the Workers' Compensation Law's exclusivity provision, which allows an employee to bring a tort action under common law. *See Valencia*, 108 S.W.3d at 242 (citing *Mize v. Conagra, Inc.*, 734 S.W.2d 334 (Tenn. App. 1987); *King v. Ross Coal Co.*, 684 S.W.2d 617 (Tenn. App. 1984); *Estate of Schultz v. Munford, Inc.*, 650 S.W.2d 37, 40 (Tenn. Ct. App. 1982); *Cooper v. Queen*, 586 S.W.2d 830, 833 (Tenn. Ct. App. 1979)). This exception is narrow and only applicable if a plaintiff-employee shows that "the employer had an *actual intent to injure* the employee." *Gonzales v. Alman Constr. Co.*, 857 S.W.2d 42, 46 (Tenn. Ct. App. 1993) (citations omitted). "Proof of gross negligence or even criminal negligence is not sufficient to establish the requisite and actual intent to injure that allows an employee to maintain a common law action against his employer." *Id.* (citations omitted). As our Supreme Court has explained:

> Plaintiff contends that public policy requires us to hold that when an employer acts in a manner substantially certain to cause death or injury it acts intentionally and such action falls within the intentional tort exception. While the traditional definition of intent used in tort law denotes the tortfeasor's desire to cause the consequences of his or her actions or the belief that the consequences are substantially certain to result from those actions, that definition is not applicable in workers' compensation cases. Rather, the definition of actual intent is the actual intent to injure the employee.

*Valencia*, 108 S.W.3d at 243 (citations omitted). Further, this Court has made clear that "knowingly permitting a hazardous work condition to exist . . . falls short of the kind of actual intention to injure that robs the injury of accidental character." *Gonzales*, 857 S.W.2d at 47 (citing *King*, 684 S.W.2d at 619).

Although Upchurch alleges that SCDE intentionally and recklessly failed to remedy the mold infestation after notice by "knowingly permitting a hazardous work condition to exist" on school grounds, the complaint is devoid of factual allegations that SCDE actually intended to injure him. Moreover, the complaint alleges that water issues that "could promote mold growth" were present for many years before Upchurch's employment with SCDE. Further, SCDE allowed Upchurch to relocate to the vocational shop at the start of the 2018-2019 school year "due to the obvious presence of mold." While we are

sympathetic to Upchurch's allegations of serious injury, we cannot infer actual intent to injure under the circumstances. The narrow exception to the Workers' Compensation Law's exclusivity provision is inapplicable in this case.

Having reviewed Upchurch's claims as being true and making all reasonable inferences in his favor, we agree with the trial court that the complaint fails to state a claim for relief. Because the Workers' Compensation Law is the exclusive remedy for the acts alleged in the complaint, the issue concerning the applicability of the GTLA is pretermitted.

**III.**

The judgment of the Sullivan County Circuit Court is affirmed. Costs of this appeal are taxed to the appellant, Michael Kevin Upchurch, for which execution may issue if necessary.

_____
KRISTI M. DAVIS, JUDGE